IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

HUNTER TILLIS, NANCY SORRELLS,      *
as grandmother, legal
custodian, and administratrix       *
of the Estate of Christian
Redwine, and HANNAH WUENSCHEL,      *

    Plaintiffs,                    *

                                 CASE NO. 4:18-CV-220 (CDL)

vs.                                 *

CONSOLIDATED GOVERNMENT OF          *
COLUMBUS, GEORGIA, *et al.*,
                               *

    Defendants.                    *

_____     *

## O R D E R

Christian Redwine led Columbus police officers on a high-speed chase after his grandfather reported that Redwine and two friends stole his Pontiac. Redwine crashed the Pontiac. As former Columbus police officer Allan H. Brown, Jr. approached the Pontiac just after the crash, the Pontiac began reversing. Brown fired eleven shots into the Pontiac. The Pontiac rolled backwards across the street, and Brown reloaded his gun and fired ten more shots into the Pontiac. All three occupants of the Pontiac sustained gunshot wounds. Redwine died on the scene, and passengers Hunter Tillis and Hannah Wuenschel were injured. Plaintiffs brought claims against Brown, the Consolidated Government of Columbus, Georgia ("CCG"), and

Columbus Police Chief Ricky Boren.[1]  Defendants filed a motion
for summary judgment (ECF No. 26), asserting that they are
entitled to summary judgment on all of Plaintiffs' claims.  As
discussed in more detail below, all Defendants are entitled to
summary judgment on all claims based on the pursuit of the
Pontiac and the first round of eleven shots; Boren is entitled
to summary judgment on all claims against him in his individual
capacity; and CCG is entitled to summary judgment on all state
law claims against it.   Brown is not entitled to summary
judgment on any of the individual capacity claims under 42
U.S.C. § 1983 or state law based on the second round of ten
shots, and CCG is not entitled to summary judgment on the § 1983
claims based on the second round of ten shots.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."   Fed. R.
Civ. P. 56(a).   In determining whether a *genuine* dispute of
*material* fact exists to defeat a motion for summary judgment,
the evidence is viewed in the light most favorable to the party
opposing summary judgment, drawing all justifiable inferences in
the opposing party's favor.   *Anderson v. Liberty Lobby, Inc.*,

---

[1] Plaintiffs brought three separate actions, which were consolidated
for all pretrial proceedings.   Order to Consolidate Case (Dec. 11,
2018), ECF No. 16 in 4:18-cv-220.

477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiffs, the record reveals the following facts. The present record includes audio and video recordings of the incident.  In determining whether there is a genuine fact dispute, the Court must view "the facts in the light depicted by the" recordings and may not adopt a version of the facts that is "utterly discredited" by the recordings.  *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).  "But where the recording does not clearly depict an event or action, and there is evidence going both ways on it," the Court must take the Plaintiffs' version of what happened.  *Shaw v. City of Selma*, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018).

## I.   The 911 Call

Christian Redwine lived with his grandmother, Nancy Sorrells, and her friend Fred Levins.  Levins considered Redwine to be his grandson.  Levins kept vehicles for his car business at the house, including a 2006 Pontiac G6.  On November 5, 2016, Redwine spent most of the day at home with his cousin Hunter Tillis.  Hannah Wuenschel joined them in the late afternoon. Levins went to bed around 11:00 p.m.  When he woke up around

1:00 a.m. on November 6, 2016, he realized that Redwine, Tillis, and Wuenschel were gone; so was the Pontiac.

At 3:34 a.m., Levins called 911 to report the Pontiac stolen. *See generally* Pls.' Notice of Manual Filing Ex. B, Audio Recording of Levins Call to 911, ECF No. 48. Columbus 911 called Levins back at 3:38 a.m., and Levins reported that his seventeen-year-old grandson Christian, Christian's cousin Hunter, and a girl named Hannah took the car. Pls.' Notice of Manual Filing Ex. C, Audio Recording of Call from 911 to Levins 00:53-1:13, ECF No. 48. Levins stated, "I want 'em in jail." *Id.* at 1:14-1:16. Levins also told Columbus 911 that he wanted police "to check them before they pull back in the drive." *Id.* at 1:32-1:35.

At 3:40 a.m., Columbus 911 dispatched two police officers to follow up with Levins regarding his 2006 Pontiac G6 "with a paper tag that was taken by family members." Pls.' Notice of Manual Filing Ex. D Part 1, 034051 Radio Recording 00:30-00:37, ECF No. 48. Shortly after that, Columbus 911 redirected the officers to another call. Pls.' Notice of Manual Filing Ex. D Part 2, 034251 Radio Recording 00:20-00:23, ECF No. 48. At 3:53 a.m., Columbus 911 dispatched another officer to follow up with Levins. Pls.' Notice of Manual Filing Ex. D Part 3, 035321 Radio Recording 00:23-00:42, ECF No. 48. Officer Matthew Fuller responded, and Levins reported that Redwine, whom Levins

described as his grandson, took the Pontiac with Tillis and Wuenschel. Fuller called his supervisor, Sergeant Wendy Thornton, and communicated this information to her.

## II. The Pursuit

Redwine drove the Pontiac. Wuenschel sat in the front passenger seat, and Tillis sat in the back seat behind Redwine. They rode around for a while, and they ended up in the parking lot of a shopping center on Milgen Road in Columbus. Around 4:23 a.m., Captain William Turner, who was in an unmarked vehicle, called dispatch asking for a marked patrol car to stop and check a Pontiac G6. Pls.' Notice of Manual Filing Ex. D Part 9, 042314 Radio Recording 00:26-00:38, ECF No. 48. Turner wanted to check the Pontiac because there had been burglaries in the area and he observed the Pontiac enter the shopping center parking lot even though all the stores were closed, pull in by a bush, turn off the lights, sit for a minute or so, turn on the lights, and pull out of the parking lot. Turner Dep. 73:17-74:15, ECF No. 37.

The Pontiac turned left onto University Avenue, then right onto College Drive and stopped at the entrance to an apartment complex. Turner pulled behind the Pontiac. He could see that there were at least two people inside, although he did not share that information with anyone. Turner Dep. 80:19-82:3. Turner reported over the radio, "I turned my blue lights on and he's

running. He don't have a tag." Pls.' Notice of Manual Filing Ex. C Part 10, 042506 Radio Recording 00:30-00:34, ECF No. 48; *accord* Defs.' Notice of Manual Filing Attach. 2, 911 Audio Recording Track l.wma 2:13-2:16, ECF No. 42 ("911 Audio Recording"). The Pontiac drove away at a high rate of speed. Wuenschel Dep. 89:9-19, ECF No. 39. With his siren and blue lights activated, Turner pursued the Pontiac, and other police officers joined the pursuit. Thornton asked dispatch if the Pontiac Turner was pursuing was the stolen Pontiac. 911 Audio Recording 2:21-2:24. About a minute later, Thornton reported to Turner, "we have a [stolen] vehicle that's just been reported, with a paper tag." *Id.* at 3:43-3:47. Another minute later, after Turner had followed the Pontiac from College Drive to Camille Drive to Hilton Avenue to Warm Springs Road to Talbotton Road, Thornton reported, "be advised that is our [stolen] vehicle." *Id.* at 5:04-5:06.

According to Tillis, Redwine was driving "at a high rate of speed [and] had to lock the brakes up every time he came to an intersection just to turn." Tillis Dep. 119:21-24, ECF No. 35. Tillis also stated that Redwine "was driving crazy, pulling up on the e-brake, making the car slide all over the place, it was crazy." Tillis Dep. Ex. 1, Officer Report 2016111409270 at CCG 01625, ECF No. 35-1 at 2; *accord* Tills Dep. 120:18-19, ECF No. 35 ("He was driving so crazy, I was ready to get out of the

car.").[2]  In addition, Turner observed the Pontiac run at least two stop signs.  Turner Dep. Ex. 1, Turner OPS Interview 3, ECF No. 37-1 at 3.

After pursuing the Pontiac for two more minutes from Talbotton Road to Veterans Parkway to 39th Street, the police lost sight of the Pontiac.  911 Audio Recording 5:08-7:07 (describing the Pontiac's movements).  Redwine pulled over to the side of the road near the Ashley Station Apartments area off of 12th Avenue and told Tillis and Wuenschel that if they were "going to get out, that [they] needed to get out now."  Tillis Dep. 121:14-18.  But then the police officers turned onto the street where Redwine was parked, and Redwine "hit the gas again."  *Id.* at 122:1-3.  Officers pursued the Pontiac from the Rose Hill neighborhood toward downtown Columbus via Linwood Avenue and 6th Avenue.  The Pontiac turned right onto 11th Street, heading the wrong way down a one-way street.  The

---

[2] Plaintiffs assert that this description "does not match what the Pontiac was doing during the pursuit."  Pls.' Resp. to Defs.' Statement of Material Facts ¶ 46, ECF No. 49-1 at 24.  In support of this assertion, Plaintiffs pointed generally to Exhibit G, which is the twenty-nine-part dashcam video from Brown's patrol vehicle and appears to cover the time period from 4:33 a.m. to sometime after 9:13 a.m.  Plaintiffs did not point to which specific part of the video does not match Tillis's description of the events.  The Court reviewed Part 1 of Exhibit G, which covers from 4:33 a.m. through the time of the shooting less than ten minutes later.  *See generally* Pls.' Notice of Manual Filing Ex. G Part 1, CPD-595_Nov.06.2016_04.33.30 Dash Cam Video of Allan Brown, ECF No. 48.  The video does not show the entire pursuit.  Turner began pursuing the Pontiac several minutes before Brown joined the pursuit and activated his dash camera.  And, the Pontiac is not visible for the first few minutes of the video.  Thus, Brown's dash cam video does not contradict Tillis's statements that his cousin was "driving crazy" during the pursuit.

Pontiac turned right onto Veterans Parkway and then left onto 13th Street, heading west toward Phenix City, Alabama.

Around 4:30 a.m., Brown was at the Columbus Police headquarters. Although Brown was assigned to the Sector B squad and the Sector A squad was pursuing the Pontiac, Brown heard about the pursuit and decided to join it. Brown joined the pursuit and activated his dash camera at 4:33 a.m. As the Pontiac crossed the 13th Street bridge into Alabama, Brown took over as lead police vehicle. Brown chased the Pontiac through Phenix City at high rates of speed, and the Pontiac ultimately went north on Highway 280, then turned right onto Highway 80, heading eastbound toward Columbus.[3] Based on the Court's review of the available dash camera footage, the roads appear almost abandoned except for the Pontiac and the police cars chasing it.

Brown asked if the vehicle was stolen, and Turner confirmed that it was a stolen "G6 with a paper tag." Pls.' Notice of Manual Filing Ex. G Part 1, CPD-595_Nov.06.2016_04.33.30 Dash Cam Video of Allan Brown 6:30-6:41, ECF No. 48 ("Brown Dash Cam Video"). Brown did not ask for details about the Pontiac, who was in it, or the circumstances of the theft. And, no officers provided any details. As the chase neared the Riverchase exit,

---

[3] Plaintiffs contend that the specific rates of speed Brown reported via the radio cannot be confirmed—speeds above 90 miles per hour on 13th Street and 14th Street in Phenix City and speeds above 100 miles per hour on Highway 80—but they do not dispute that it was a high-speed chase, and they did not point to any evidence to dispute the reported speeds.

Brown reported high speeds and zero traffic. *Id.* at 6:43-6:49. Instead of going over the bridge back into Georgia, the Pontiac took the Riverchase exit and turned right. Shortly after that, the Pontiac crashed into some bushes. Brown reported that the Pontiac had "wrecked out" and was "spinning," and he asked dispatch to "start rescue." *Id.* at 7:49-7:56.

## III. The Shooting

Brown stopped his police car a few feet from the rear of the Pontiac's passenger side. *Id.* at 7:59. He was not directly behind the Pontiac, so if the Pontiac reversed straight back neither Brown nor his police car were in its path. Brown exited his vehicle. Brown did not give any verbal commands that are audible on the dash cam video.[4] The Pontiac's reverse lights came on, and the car started backing up. As soon as the Pontiac started backing up, Brown began firing at it with his service revolver. *Id.* at 8:02-8:07. He fired eleven shots into the vehicle as it reversed past him. After the first round of shots, Wuenschel screamed, "No! Stop! Please! I got shot! Please, please, please!" *Id.* at 8:07-8:12. The Pontiac rolled straight backwards across the street and came to a "gentle stop." Tillis Dep. 137:22-138:3. Brown reloaded and fired ten more shots into the Pontiac. *Id.* at 8:12-8:16. After the

---

[4] Brown was not wearing a body camera. He was wearing a body microphone. It is the Court's understanding that the sounds captured by Brown's body microphone are audible on the dash camera video, and there is not a separate audio recording in the record.

second round of shots, Tillis and Wuenschel got out of the car. Brown ordered them to get on the ground, and he held them at gunpoint until other officers arrived. Emergency medical personnel arrived by 4:49 a.m. and provided assistance to Tillis and Wuenschel. Redwine was pronounced dead.

## A. Brown's Position During the First Round of Shots

The video does not show much of the shooting. The Pontiac is only visible for the first seven or so shots, and the video only shows the first two shots hitting the rear windshield. Brown is not visible in the video, so the video does not show where he was standing at any point during the shooting. Brown says that he was directly behind the Pontiac when it began reversing and that he believed it was trying to run over him, so he began firing as he moved back toward his patrol car.[5] Brown Dep. Vol. I 190:4-14, ECF No. 28. As the Pontiac passed him, Brown was concerned that the driver might still quickly jerk the wheel and hit him. *Id.* at 228:5-9.

Plaintiffs pointed to evidence to dispute Brown's testimony regarding his position during the first eleven shots, which the

---

[5] In his initial interview with Columbus Police's Office of Professional Standards a few hours after the shooting, Tillis stated that Brown was behind the rear bumper of the Pontiac, on the passenger side. Tillis Dep. Ex. 5, Tillis OPS Interview 7 (Nov. 6, 2016), ECF No. 35-5. Tillis also stated in the interview that Brown "could have been" in the path of the Pontiac when Redwine began reversing and that he understood Brown "had every reason to shoot because Christian could have ended up killing him with that car, revving it backwards like that." *Id.* at 9, 15. Tillis later said that these statements were wrong. Tillis Dep. 219:6-220:2.

Court also refers to as the first round of shots. First, Tillis stated that Brown was not in the path of the Pontiac when Brown started shooting. Tillis Dep. 219:6-220:2. Rather, Tillis testified that he "could see the police officer standing between his car and his door. And from that time till the time the gunshots -- when that first shot hit, he was still standing between his car and his door." *Id.* at 137:7-11. Tillis had no concerns that Redwine would run over Brown because Brown "wasn't directly behind the car. He was off to the side of the car." *Id.* at 140:21-141:2. Tillis further testified in his deposition that when the Pontiac reversed, it went "straight backwards" and did not curve before it came to a "gentle stop" across the street. *Id.* at 137:22-138:3.

Second, Plaintiffs pointed to the opinion of their expert witness, William Harmening. According to Harmening, "Brown was never in danger of being hit by the [Pontiac]." Harmening Dep. Ex. 8, Harmening Report 13, ECF No. 41-8. The first five shots "entered through the passenger side of the rear window in a right-to-left trajectory toward the driver." *Id.* at 8. Based on the trajectory, Harmening opines that Brown "was to the rear and to the right of the vehicle" when he fired those shots, not directly behind it. Harmening Dep. 142:18-21, ECF No. 41. Harmening also opines based on the location of the casings and other factors that Brown was "very close" to the Pontiac when he

shot through the rear windshield. *Id.* at 144:3-7. Harmening further opines that Brown continued shooting as the Pontiac rolled past him; shots six and seven "entered through the rear passenger-side window in a right-to-left trajectory," and shots eight through eleven "entered through the front passenger-side window straight on and perpendicular to the movement of the vehicle." Harmening Report 8.

### B. Brown's Position During the Second Round of Shots

After the first round of shots, the Pontiac was still rolling in reverse as Brown reloaded his weapon. He was about fifteen feet away from the Pontiac, "moving forward to effect an arrest." Brown Dep. vol. I 253:16-18. Brown testified that as he moved toward the Pontiac, he heard the Pontiac's engine rev loudly and thought the driver "was going to try to run [him] over again." *Id.* at 253:1-7. Brown fired ten more shots toward the Pontiac. The Court refers to these ten shots as the second round of shots.

It is undisputed that the Pontiac was still reversing as Brown reloaded his weapon; the Pontiac's gear shifter was still in reverse when investigators arrived on the scene. There is no evidence that the Pontiac moved forward toward Brown before the second round of shots. And, although Brown's dash camera and body microphone captured audio of many things during the six seconds between the first round of shots and the second round of

shots—including Wuenshel's screaming, the low hum of Brown's patrol car engine, some noises that sound like metal hitting pavement, and sirens of approaching emergency vehicles—no loud revving of the Pontiac is discernible during that timeframe. Brown Dash Cam Video 8:06-8:12. Defendants' experts concede that there is no revving sound on the recording. They offer several explanations for why Brown claims to have heard a revving sound, but they also concede that it is possible there was no revving sound and that Brown made it up. Jury Dep. 120:6-17, ECF No. 69.

C.  Plaintiffs' Gunshot Wounds

Redwine was shot eleven times. The parties agree that the present record does not establish when Redwine died. Plaintiffs assert that the present record also does not establish which shots were fatal. But in their statement of material facts, Defendants pointed to evidence that an Alabama State Bureau of Investigations special agent who attended the autopsy reported, "The fatal wounds were identified as two (2) gunshot wounds that were located in the upper back area of the right shoulder that penetrated the lungs and aorta." Harmening Dep. Ex. D10, Investigative Summary, ECF No. 41-10. And, Plaintiffs' expert testified that two of the first five shots caused the wounds that the pathologist described as the fatal wounds. Harmening Dep. 274:2-12. Plaintiffs did not point to evidence to dispute

this evidence that two of the first five shots struck Redwine and were the fatal shots.

It is undisputed that Tillis was shot once during the second round of shots; the bullet entered his nose and exited his mouth. Wuenschel was shot once during the first round of shots; the bullet entered her left shoulder and exited through her elbow. *See* Pls.' Resp. to Defs.' Statement of Material Facts ¶ 118 (admitting that "Wuenschel was shot by one of the bullets fired from the first magazine"); *accord* Brown Dash Cam Video 8:07-8:12 (audio of Wuenschel yelling "I got shot" after the first round of shots). At the hearing on the summary judgment motion, Wuenschel's counsel suggested that there is a fact question on when Wuenschel was shot. But Wuenschel did not point to any evidence to create a fact question on this issue.

## IV. Plaintiffs' Claims

Plaintiffs brought individual capacity claims against Brown under § 1983, asserting that Brown violated their constitutional rights by improperly pursuing the Pontiac and by subjecting them to excessive force and unreasonable seizure.[6] Tillis also asserts that Brown was deliberately indifferent to his serious medical needs. Plaintiffs brought supervisory liability claims

---

[6] Sorrells brought claims against Defendants as grandmother and legal custodian of Redwine and as administrator of his estate. For the sake of simplicity, the Court includes Redwine as a "Plaintiff" when the Court analyzes whether Defendants violated the constitutional rights of "Plaintiffs."

against Columbus Police Chief Ricky Boren in his individual capacity, alleging that Boren is liable under § 1983 based on his hiring, training, supervision, and retention of Brown. Plaintiffs also brought claims against CCG, claiming that CCG's policies and customs were the moving force behind any constitutional violations they suffered.[7]  And, Plaintiffs brought various state law claims against Brown, Boren, and CCG.

DISCUSSION

Defendants contend that they are entitled to summary judgment on all of Plaintiffs' claims.

## I.  Plaintiffs' Individual Capacity § 1983 Claims Against Brown

Brown seeks qualified immunity on all of Plaintiffs' § 1983 claims against him.  "Qualified immunity protects a government official from being sued for damages under § 1983 unless preexisting law clearly establishes the unlawfulness of his actions, such that any reasonable official in his position would be on notice that his conduct was unlawful."  *Hunter v. City of Leeds*, 941 F.3d 1265, 1278 (11th Cir. 2019).  To receive qualified immunity, "an official must first establish that he was acting within his discretionary authority when he engaged in the allegedly unlawful conduct."  *Id.*  There is no dispute that

---

[7] Plaintiffs' official capacity claims against Boren and Brown are considered claims against their employer, CCG.  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)).

Brown was performing discretionary functions when he pursued the Pontiac and shot into it. Thus, Plaintiffs must show that Brown violated their constitutional rights and that those rights were clearly established at the time of the pursuit and shooting. *Id.* "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (alteration in original) (quoting *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019)).

"A plaintiff can show that his constitutional rights were clearly established in any one of three ways." *Id.* "First, he can point to a materially similar case decided by the Supreme Court, [the Eleventh Circuit], or the highest court of the relevant state that clearly establishes the unlawfulness of the police conduct." *Id.* "Second, even in the absence of such precedent, a plaintiff can point to a 'broader, clearly established principle [that] should control the novel facts in [his] situation,' provided that the principle gives the officer 'reasonable warning that the conduct at issue violated constitutional rights.'" *Id.* (alterations in original) (first quoting *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013) and then *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). "Third, a plaintiff can show that the conduct at issue 'lies so obviously at the very core of what the [Constitution] prohibits that the

unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law.'" *Id.* (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002)).

A.  Claims Based on the Pre-Shooting Pursuit

Plaintiffs assert that Brown's pursuit of the Pontiac violated their Fourteenth Amendment substantive due process rights. The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has concluded that this provision bars "certain government actions regardless of the fairness of the procedures used to implement them." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). The substantive component of the Due Process Clause is violated by an official's conduct that amounts to deliberate indifference to life and safety and shocks the conscience. *Id.*

An officer does not violate "the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." *Id.* at 836. Rather, "in such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the

conscience, necessary for a due process violation." *Id.* In *Lewis*, for example, an officer tried to pull over a motorcyclist for speeding. The motorcyclist ignored the officer and instead wove in and out of oncoming traffic. The officer chased him. The motorcyclist attempted a sharp turn and tipped over, and the officer hit the motorcyclist's passenger with his patrol car, killing him. The Supreme Court found that the officer's instinctive response—to chase the motorcyclist—was not "to terrorize, cause harm, or kill." *Id.* at 855. There was "no reason to believe that [the officer was] tainted by an improper or malicious motive," so even if the officer was reckless in his pursuit, his conduct did not shock the conscience and he could not be held liable under § 1983. *Id.*

Here, Plaintiffs argue that Brown's conduct "evinces a purpose to cause harm unrelated to the legitimate object of the arrest." Pls.' Resp. to Defs.' Mot. for Summ. J. 18, ECF No. 49. But they did not point to any evidence to support this claim arising from Brown's pre-shooting conduct. At most, they pointed to evidence that Brown disregarded the Columbus Police Department's motor vehicle pursuit policy, which requires officers to terminate pursuit of a vehicle if the "suspect's identity has been established to the point that later apprehension can be accomplished and there is no longer any need

for immediate apprehension." Turner Dep. Ex. 2, Motor Vehicle Pursuit Policy § 3-16.7, ECF No. 37-2.

Even if the Court assumes for purposes of summary judgment that Brown should have terminated the pursuit under the Columbus Police Department's policy, a mere policy violation, without more, does not establish a substantive due process violation. Again, "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." *Lewis*, 523 U.S. at 854. Here, as in *Lewis*, there is no evidence that Brown's pursuit of the Pontiac was "tainted by an improper or malicious motive on his part." *Id.* at 855. And, Plaintiffs were not injured by the pursuit or when the Pontiac wrecked. They were injured when Brown shot into the Pontiac following the wreck. Accordingly, the Court finds that Plaintiffs did not establish a Fourteenth Amendment substantive due process violation based on the pursuit. Defendants are entitled to summary judgment on this claim.[8]

B.    Claims Based on the Shootings

Plaintiffs assert that Brown violated Plaintiffs' clearly established Fourth Amendment right not to be subjected to excessive force during a seizure. Defendants argue that Brown

---

[8] Obviously, with no constitutional violation, Brown and Boren are entitled to qualified immunity as to any claims against them in their individual capacity based on the pre-shooting pursuit.

did not use excessive force against Plaintiffs when he shot into the Pontiac twenty-one times.

The first question is whether all three Plaintiffs may assert claims under the Fourth Amendment. Defendants do not dispute that Redwine was seized within the meaning of the Fourth Amendment when Brown shot him. Defendants argue that Tillis and Wuenschel were not seized within the meaning of the Fourth Amendment because a Fourth Amendment seizure "occurs 'only when there is a governmental termination of freedom of movement through means intentionally applied.'" *Vaughan v. Cox*, 343 F.3d 1323, 1328 (11th Cir. 2003) (quoting *Brower v. Cty. of Inyo*, 489 U.S. 596, 597 (1989)). The Eleventh Circuit has suggested that when an officer shoots at a vehicle intending to stop all of its occupants, the occupants are subjected to a Fourth Amendment seizure. *Id.* at 1329; *accord Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015) (analyzing passenger's claim based on shooting into a car under the Fourth Amendment); *Cooper v. Rutherford*, 503 F. App'x 672, 675 (11th Cir. 2012) (per curiam) (noting that *Vaughan* clearly established "that if a passenger-suspect is shot by a bullet intended to stop his fleeing during a chase with police officers, then he is seized for purposes of Fourth Amendment analysis"); *cf. Plumhoff v. Rickard*, 572 U.S. 765, 778 n.4 (2014) (noting disagreement among lower courts as to whether a passenger can pursue claims under a Fourth

Amendment theory and that the Eleventh Circuit in *Vaughan* suggested that passengers can). The record viewed in the light most favorable to Plaintiffs suggests that Brown intended to stop and arrest all of the occupants of the Pontiac when he shot at it, so the claims of Tillis and Wuenschel based on the shooting are properly analyzed under the Fourth Amendment's objective reasonableness standard.

An officer's use of deadly force "is a seizure subject to the Fourth Amendment's requirement of reasonableness." *Hunter*, 941 F.3d at 1278 (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). "Reasonableness is a fact-specific inquiry that turns on such factors as 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Deadly force is only reasonable for purposes of the Fourth Amendment if the officer "(1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible." *Id.* at 1279

(quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1255 (11th Cir. 2005)).  The facts must be construed in the light most favorable to Plaintiffs, but "reasonableness is determined from the perspective of the officer, and not with the '20/20 vision of hindsight.'"  *Id.* at 1279 (quoting *Graham*, 490 U.S. at 396).  To survive summary judgment, Plaintiffs must establish that, under their version of the facts that are supported by the record, *no* reasonable officer could conclude that deadly force was authorized under the circumstances.  The Court addresses each round of shots separately.

> *1.   The First Round of Shots*

"It is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself."  *Hunter*, 2019 WL 5677621, *9.  So, "it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril.'"  *Singletary*, 804 F.3d at 1181 (quoting *Robinson*, 415 F.3d at 1256).  The Eleventh Circuit has "'consistently upheld' an officer's use of deadly force in cases where the officer reasonably believed his life was endangered by a suspect who 'used or threatened to use his car as a weapon.'"  *Id.* (quoting *McCullough v. Antolini*, 559 F.3d 1201, 1207 (11th Cir. 2009)).

In *Singletary*, for example, the Eleventh Circuit reversed the district court's denial of qualified immunity because "a reasonable officer would have reasonably perceived that he was in imminent danger of being run over by [a suspect's] car," because the officer was "in the path of the car when it accelerated." *Id.* at 1182-83. Thus, the officer's "firing of his gun in an effort to stop the car did not constitute excessive force." *Id.* at 1182. Likewise, in *Robinson*, an officer did not violate the Fourth Amendment when he shot a suspect because the officer reasonably believed that the suspect was trying to crush him between two vehicles. *Robinson*, 415 F.3d at 1256. The use of deadly force was reasonable because "[e]ven if in hindsight the facts show that [the officer] perhaps could have escaped unharmed . . . a reasonable officer could have perceived that [the suspect] was using the [car] as a deadly weapon . . . [and thus the officer] had probable cause to believe that [he] posed a threat of serious physical harm." *Id.* And, in *Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002), the driver led officers on a "high-speed, reckless" chase through a residential neighborhood, ended up partially blocked in by police cars on a cul-de-sac, and remained in his car with the engine running while deputies jumped out of their cars and ordered the driver to get out of the car. *Pace*, 283 F.3d at 1277-78. The driver did not get out of the car, and his engine

remained running.  The driver's car stopped briefly, but as his car began moving forward again, one officer shot him seven times through the windshield and another officer fired five shots at the car.  *Id.* at 1178.  Based on these facts, the Eleventh Circuit could not "conclude that the Fourth Amendment ruled out the use of deadly force"—even though the evidence viewed in the light most favorable to the plaintiff suggested that the driver did not overtly aim his vehicle at the officers or try to run over them—because the officers reasonably believed based on all the circumstances that the driver posed a serious threat to the officers on the scene.  *Id.* at 1282;[9] *accord McCullough*, 559 F.3d at 1208 (finding no Fourth Amendment violation where officers "used deadly force in a split-second situation where a suspect late at night refused to pull over, engaged in a high-speed chase, and then, after pulling over, repeatedly refused to show his hands or respond to officers, revved his engine, and then drove his truck toward the deputy standing nearby in a parking lot").

---

[9] The Eleventh Circuit found that even if there had been a Fourth Amendment violation in *Pace*, the officer was entitled to qualified immunity because no authority put him on notice of a clearly established rule prohibiting him from using deadly force "where the fleeing suspect appeared to be dangerous by virtue of his hazardous driving during the long, nighttime car chase and where the suspect remained in his automobile with the engine running, even when almost surrounded by officers and where—IF the chase had ended at all—it had ended (at most) a very few seconds before the officers fired and, even then, the suspect's car started driving away again, causing more shots to be fired."  *Pace*, 283 F.3d at 1283.

Here, Brown claims that he believed he was threatened with deadly force just before the first round of shots. Plaintiffs contend that such a belief was unreasonable under the facts viewed in the light most favorable to them. Plaintiffs argue that Redwine was not threatening Brown with deadly force because Brown was not directly behind the Pontiac when Redwine began reversing and because Redwine backed straight back and did not turn the Pontiac toward Brown. So, the Court must decide whether, under the facts viewed in the light most favorable to Plaintiffs, no reasonable officer in Brown's position could conclude that he was threatened with deadly force when the Pontiac began reversing just before the first round of shots.

The Court finds that even under Plaintiffs' version of the facts, a reasonable officer in Brown's position could conclude that he was subject to an immediate threat of serious physical harm when the Pontiac began reversing. Under Plaintiffs' version of the facts, Brown was very close to the back of the Pontiac, even if he was not directly behind it, and a reasonable officer could have believed in the brief seconds between getting out of his patrol vehicle and seeing the Pontiac start to reverse that the Pontiac's driver might cut the wheel and try to hit him. *See Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly

weapon to act to stop the suspect."). That is so even if an expert later concluded from the calm and safety of his office, where he could study each millisecond of the dash camera footage frame by frame and perform mathematical calculations regarding the path of each bullet, that Brown was never theoretically in any true danger of being hit because it would have been impossible for the Pontiac to strike him without defying the laws of physics. Even if Brown was not actually in the zone of danger, it was not unreasonable under the circumstances for him to believe that he was. The Court therefore finds that Brown did not violate the Fourth Amendment when he fired the first eleven shots.

Even if Brown did violate the Fourth Amendment with the first eleven shots, Plaintiffs pointed to no authority suggesting that an officer who is standing close to a driver's path cannot reasonably believe that he faces a deadly threat until the moment the driver cuts the wheel toward him. S*ee Pace*, 283 F.3d at 1282 (concluding at the summary judgment stage that officers did not use excessive force in shooting a suspect who had stopped his vehicle after a high-speed chase—even though the court accepted that, at the time of the shooting, the suspect had neither tried to run over nor aimed the vehicle at officers). For these reasons, it was not clearly established on November 6, 2016 that the first eleven shots would violate

Plaintiffs' Fourth Amendment rights.  Accordingly, if Brown did violate the Fourth Amendment when he fired the first round of shots, he is nevertheless entitled to qualified immunity as to those shots.

### 2.   The Second Round of Shots

The second round of ten shots is a different story.  Though "the use of deadly force may initially be justified, the level of force that is reasonable may change during the course of a police encounter." *Hunter*, 941 F.3d at 1280.  The force used by a police officer "must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Id.* (quoting *Lee*, 284 F.3d at 1198).  "The allowable level of continued force thus diminishes with the threat." *Id.*  So, when a suspect becomes unarmed or no longer poses an immediate risk of serious harm, continued deadly force against that suspect is excessive.  *Id.* at 1280-81 (finding that it was clearly established by December 2013 that after a suspect relinquished his weapon, an officer's continued firing at the suspect constituted excessive force).

Here, Defendants argue that the Pontiac posed an imminent threat to Brown until he was sure that the driver had been "disarmed."  In support of this argument, Defendants cite *Jean-Baptiste v. Gutierrez*, 627 F.3d 816 (11th Cir. 2010), where an

officer shot an armed robbery suspect who was holding a gun. Although the suspect fell, he was still holding his gun, and the officer continued shooting until he was sure the suspect had been disarmed.  The Eleventh Circuit stated, "[a] police officer is entitled to continue his use of force until a suspect thought to be armed is 'fully secured.'"  *Id.* at 821 (11th Cir. 2010) (quoting *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009).  But this case does not involve a suspect holding a gun, and Defendants' suggestion that Plaintiffs were "armed with a car" as long as they occupied it is unpersuasive.  Viewing the evidence in the light most favorable to Plaintiffs, Brown was in no danger when he fired the second round of shots—shots twelve to twenty-one.

Under Plaintiffs' version of the facts, Brown was fifteen feet away from the Pontiac when he reloaded his weapon.  In the six seconds after the first eleven shots but before the second round of shots, Brown did not seek cover.  Instead, he began walking toward the Pontiac, which was either slowly rolling backwards or had come to a gentle stop, "to effect an arrest." Brown Dep. vol. I 253:16-18.  Then he shot an additional ten bullets.  The Pontiac never moved forward toward Brown.  And, under Plaintiff's version of the facts, Brown's sole justification for the second round of shots—a loud revving noise that prompted him to believe the Pontiac might accelerate toward

him—did not happen.  Based on these facts, no reasonable officer in Brown's position would have concluded that the Pontiac posed a imminent threat of serious physical harm to himself when Brown decided to shoot at the Pontiac ten more times.  *See Morton*, 707 F.3d at 1284-85 (finding that an officer was not entitled to qualified immunity when the plaintiff's evidence established that (1) the plaintiff was parked in a parking lot with his engine running, (2) the plaintiff slowly coasted away when he saw a police truck enter the parking lot, (3) when the plaintiff noticed a police officer chasing him he shifted his car into park and raised his hands, and (4) the officer had no probable cause to believe that the plaintiff committed any crime or that the plaintiff was a threat to anyone); *cf. Hunter*, 941 F.3d at 1280 (concluding that under the plaintiff's version of the facts, the officer violated the plaintiff's clearly established Fourth Amendment rights because he fired seven shots at a man who was unarmed because he dropped his gun).

Defendants argue that even if Brown was not in immediate danger, he was authorized to use deadly force because the Pontiac posed a continued threat to the community while the engine remained running and a suspect was still at the wheel. Defendants urge the Court to conclude that the additional force was justified because if the Pontiac got back on the empty pre-dawn Sunday morning roads, it might have hit a hypothetical dog

walker or crashed into a hypothetical house's bedroom. But the caselaw does not permit deadly force based on sheer speculation. Rather, there must be some real imminent threat.

While the Court does not typically expand the length of its orders unnecessarily by abstracting every case relied upon by a party, the Court finds it appropriate here to carefully analyze the cases relied upon by Defendants given their counsel's incredulity at the hearing on their motion when the Court suggested that the cases were perhaps distinguishable. Confirming its suggestion at the hearing, the Court explains below why Defendants' zealous reliance upon these cases is misplaced. These cases addressing when an immediate threat to the public exists justifying the use of deadly force are all distinguishable, and a reasonable law enforcement officer would know they are distinguishable from the circumstances confronting Brown when he emptied his weapon the second time into a stopped vehicle occupied by helpless passengers.

In *Mullenix v. Luna*, 136 S. Ct. 305 (2015) (per curiam), a suspect fled in his vehicle after officers approached him with an arrest warrant. The suspect led officers on a high-speed chase on an interstate where traffic was light. During the chase, the suspect called 911 twice and told the dispatcher that he had a gun and would shoot police officers if they did not abandon their pursuit; the dispatcher relayed this information

to the officers and reported that the suspect might be intoxicated. As other officers prepared to deploy spike strips to stop the suspect's car, one officer decided to try and shoot at the suspect's car to disable it because he believed that the suspect "might attempt to shoot at or run over the officers manning the spike strips" or "might still be able to continue driving in the direction of other officers" after he hit the spike strips. *Id.* at 310. The Supreme Court found that the officer was entitled to qualified immunity because "he reasonably understood [the suspect] to be a fugitive fleeing arrest, at speeds over 100 miles per hour, who was armed and possibly intoxicated, who had threatened to kill any officer he saw if the police did not abandon their pursuit, and who was racing towards [another officer's] position." *Id.* at 312.

In *Plumhoff v. Rickard*, 572 U.S. 765 (2014), a suspect was stopped because his car had only one working headlight. When the officer started asking questions about whether the suspect had been drinking and why there was a large indentation in the windshield, the suspect sped away. Officers pursued the suspect to I-40 in Memphis, and their attempt at a "rolling roadblock" failed. The chase continued, passing "more than two dozen vehicles," "several of which were forced to alter course." *Id.* at 769, 776. The suspect exited I-40, hit a police cruiser, spun out into a parking lot, and collided with another police

cruiser. Two officers got out of their vehicles and approached the suspect's car, and the suspect backed into a third police cruiser. An officer fired three shots into the suspect's car, but the suspect maneuvered away from the officers and continued fleeing down the street. Two other officers fired twelve more shots into the suspect's car, which crashed into a building. Both the suspect and his passenger were killed. The Supreme Court found that the officers did not use excessive force because a reasonable officer could have concluded that the suspect's "outrageously reckless driving posed a grave public safety risk" and that the suspect "was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." *Id.* at 776-77. The Supreme Court emphasized that the suspect kept driving even after all the shots were fired and stated that it "would be a different case if [the officers] had initiated a second round of shots after an initial round had clearly incapacitated [the suspect] and had ended any threat of continued flight." *Id.*

In *Scott v. Harris*, 550 U.S. 372 (2007), a deputy tried to pull over a suspect for speeding. The suspect sped away and initiated a high-speed chase, running multiple red lights, swerving "around more than a dozen other cars, cross[ing] the double-yellow line, and forc[ing] cars traveling in both directions to their respective shoulders to avoid being hit."

*Id.* at 379. An officer decided to try and terminate the chase by applying "his push bumper to the rear of [the suspect's] vehicle." *Id.* at 375. The suspect lost control of the vehicle and crashed. The Supreme Court found that the officer did not violate the Fourth Amendment when he bumped the suspect's car, causing it to crash, because the suspect led officers on "a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." *Id.* at 380.

In *Brosseau v. Haugen*, 543 U.S. 194 (2004) (per curiam), an officer reported to the scene of a fight. A suspect got into a vehicle and, after a tussle with the officer, fled in the vehicle. There were several other officers on foot in the area, as well as a number of bystanders, and the officer feared for their safety. The officer fired one shot at the suspect, hitting him in the back, and the suspect stopped. The suspect later admitted to driving with "wanton or willful disregard for the lives . . . of others." *Id.* at 197 (quoting Wash. Rev. Code § 46.61.024). The Supreme Court concluded that the officer was entitled to qualified immunity because it was not clearly established that her shooting at a fleeing suspect would violate the Fourth Amendment under the circumstances the officer faced, where there were several people in the immediate area who were at risk because of the suspect's reckless driving.

In *Long v. Slaton*, 508 F.3d 576 (11th Cir. 2007), the Eleventh Circuit found no excessive force where an officer shot a mentally unstable person who avoided police capture, stole a marked police cruiser, and was attempting to flee in the police cruiser. "Although at the point of the shooting [the suspect] had not yet used the police cruiser as a deadly weapon, [the suspect]'s unstable frame of mind, energetic evasion of the deputy's physical control, [the suspect]'s criminal act of stealing a police cruiser, and [the suspect]'s starting to drive—even after being warned of deadly force—to a public road gave the deputy reason to believe [the suspect] was dangerous." *Id.* at 581–82.

Lastly, in *Beshers v. Harrison*, 495 F.3d 1260 (11th Cir. 2007), an officer responded to a report that an intoxicated suspect tried to steal beer from a convenience store after the clerk refused to sell it to him. The suspect led the officer on a chase on a busy four-lane road, weaving through traffic. He avoided one roadblock and continued weaving through traffic, forcing "numerous motorists to the side of the road." *Id.* at 1262. An officer managed to pass the suspect, hoping to encourage him to slow down and to warn oncoming traffic. The suspect tried to pass the officer, but the officer's cruiser clipped the back of the suspect's truck, causing it to crash. The Eleventh Circuit found that even if the officer

intentionally hit the suspect's car and caused it to crash (which was a fact dispute), there was still no Fourth Amendment violation because the officer had reason to believe that the suspect "was a danger to the pursuing officers and others and was driving under the influence of alcohol." *Id.* at 1268.

In summary, all the cases Defendants rely upon to support their "threat to others" theory involved an *imminent* threat to the safety of others. Here, in stark contrast, even if Brown reasonably concluded that the Pontiac might attempt to flee after it slowly rolled across the street and came to a gentle stop, the present record simply does not support the conclusion by a reasonable officer of an imminent threat to the safety of others. Of course, there is always some theoretical risk that a driver who has driven recklessly immediately prior to being subdued may continue such driving if he were to resume his escape. But even if this minimal risk existed, the situation here was still clearly distinguishable from *Scott*, *Plumhoff*, and *Beshers*, because the roads were virtually empty. There were no other officers on foot and no other bystanders as there were in *Brousseau*. The Pontiac was not a stolen police car driven by a suspect suffering a psychotic episode as in *Long*. And there were no threats that the occupants of the Pontiac might shoot officers as in *Mullenix*. These cases simply do not justify concluding that Brown is entitled to qualified immunity

regarding the second round of shots. To hold otherwise would immunize law enforcement officers from liability any time that the speculative possibility of remote danger to some unknown party theoretically arises. Under this remarkably broad proposition, officers would be immunized such that they could shoot to kill any suspect who they subjectively believe may not be fully subdued. That is not the law; that is not what the cases relied upon by Defendants hold. In fact, clearly established law is to the contrary.

Under Plaintiffs' version of the facts, no reasonable officer in Brown's position would have concluded that the Pontiac posed a serious threat of imminent harm to himself or others when Brown decided to fire the second round of shots. It was clearly established on November 6, 2016 that when a suspect no longer poses an immediate risk of serious harm, continued deadly force against that suspect is excessive. Brown is not entitled to summary judgment on his qualified immunity defense to Plaintiffs' Fourth Amendment claims arising out of the second round of shots.

Defendants' motion for summary judgment is complicated by the Court's conclusions that the first round of shots did not violate the Fourth Amendment but that the second round of shots did. If any of the occupants of the vehicle were solely injured by the first round of shots, then they would have no claim.

Based on the present record, it appears that Wuenschel was hit once and Redwine twice during the first round of shots. The Court finds, however, that given the expedited and restricted nature of the pending summary judgment motion, the record is not fully developed for the Court to decide this causation issue as a matter of law at this stage of the proceedings.[10] Thus, while Brown is not entitled to summary judgment based on qualified immunity as to the second round of shots, it remains to be seen whether he is entitled to summary judgment based on causation.

### C. Tillis's Medical Need Claim

Tillis initially asserted that Brown was deliberately indifferent to his serious medical needs, in violation of the Fourteenth Amendment. He now concedes that he has no such claim. Pl.'s Resp. to Defs.' Mot. for Summ. J. 30, ECF No. 49. Defendants are entitled to summary judgment on this claim.

## II. Plaintiffs' Individual Capacity Claims Against Boren

In addition to their § 1983 claims against Brown, Plaintiffs bring § 1983 claims against Columbus police chief Ricky Boren under a supervisor liability theory. Supervisory officials like Boren "are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of

---

[10] The Court permitted the parties to conduct limited discovery necessary to present the qualified immunity defenses to the Court in an expedited manner. While this discovery may have touched upon these causation issues, the Court finds that Plaintiffs should be given the opportunity to fully develop the record on causation before the Court addresses it as a matter of law.

respondeat superior or vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)). "Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Id.* "The necessary causal connection can be established 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'" *Id.* (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003)). "Alternatively, the causal connection may be established when a supervisor's 'custom or policy . . . result[s] in deliberate indifference to constitutional rights' or when facts support 'an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" *Id.* (quoting *Gonzalez*, 325 F.3d at 1234-35) (alterations in original).

Plaintiffs did not point to any evidence to suggest that Boren was personally involved in the incidents giving rise to this action or that he directed Brown to act unlawfully. And, as discussed above, Plaintiffs did not establish a

constitutional violation based on the pursuit of the Pontiac or Brown's first round of shots. Thus, Boren is entitled to summary judgment on his qualified immunity defense regarding any injuries caused by Brown's pursuit or first round of shots. The remaining issue is whether Boren is entitled to qualified immunity under a supervisor liability theory for Brown's second round of shots. Plaintiffs did not point to any policy or custom Boren had that resulted in deliberate indifference to constitutional rights.[11] So the Court must decide whether the facts support an inference that Boren knew that Brown would act unlawfully but failed to stop him.

According to Plaintiffs, Brown was involved in ten use of force incidents before November 6, 2016. Each incident was investigated by the Columbus Police Department, and Plaintiffs acknowledge that these investigations concluded that Brown did not violate department policies, including the use of force policy. Plaintiffs did not point to evidence that these incidents resulted in citizen complaints, that these incidents

---

[11] Plaintiffs argue that discovery regarding Boren's "*Monell* liability" was stayed. Under *Monell*, a local government is liable under § 1983 only when its "official policy" causes a constitutional violation. *Monell*, 436 U.S. at 694. Here, the parties agreed to "expedited" discovery "limited to matters related to immunity under state and federal law and the alleged violation of the Plaintiffs' state and federal constitutional rights." Scheduling & Disc. Order 3-4, ECF No. 18. Certainly, the question whether Boren had an official policy or an unofficial custom or practice that caused a constitutional violation is a matter related to Boren's immunity. So, to the extent Plaintiffs argue that they cannot point to Boren's policy or custom because they have not yet conducted discovery on this issue, the Court rejects that argument.

amounted to constitutional violations, or that Brown should have been disciplined for these incidents.

Plaintiffs also pointed to evidence that Brown was disciplined for violating Columbus Police Department policy on three separate occasions.  First, Brown was disciplined in 2013 for insubordination because he did not follow up on a battery report after his supervisor instructed him to do so.  Second, he was disciplined in 2014 for neglect or dereliction of duty when he drove his patrol vehicle 57 miles per hour over the posted speed limit and wrecked with a civilian vehicle.  Third, Brown underwent an Employee Early Warning Session on September 14, 2016 because of a March 2016 vehicle pursuit violation.[12]  He was counseled regarding the violation and reminded of the motor vehicle pursuit policy, and he promised to follow the Columbus Police Department policy on vehicle pursuits in the future. Pls.' Resp. to Defs.' Mot. for Summ. J. Ex. F, Inter-Office Communication from J. Hawk to F. Blackmon (Sept. 14, 2016), ECF No. 55-2 at 7.  Brown was also suspended for one day as a result of the violation, and he was warned that future violations would result in additional discipline.  *Id.*  Finally, Brown was "to be closely monitored to ensure that he perform[ed] his duties

---

[12] It is undisputed that Brown violated the Columbus Police Department's vehicle pursuit policy on March 16, 2016 when he initiated a pursuit for a non-custodial violation and continued the pursuit even though the necessity to apprehend did not outweigh the danger that was created by the pursuit.

without any issues, problems, or violations of policy." *Id.* This evidence does not support an inference that Boren knew that Brown would use excessive force but failed to stop him from doing so. Rather, it suggests that the Columbus Police Department took steps to discipline and counsel Brown after he violated the Department's policies for infractions that did not involve use of force.

Finally, Plaintiffs argue that Brown was supposed to be under close monitoring on November 6, 2016 but was not actually being closely monitored by his direct supervisors. Plaintiffs suggest that if Brown really was being closely monitored based on his violation of the motor vehicle pursuit policy, he should not have been permitted to join the pursuit of the Pontiac. Even if Plaintiffs pointed to evidence suggesting that Brown's direct supervisors were not closely monitoring him when he decided to join the pursuit, the present record shows that Boren received a memorandum stating that Brown had violated the Department's motor vehicle pursuit policy and would be closely monitored. Boren should be able to rely on his subordinates to carry out this portion of Brown's discipline, absent some evidence suggesting that Boren knew that they would not do so. Plaintiffs pointed to no evidence that Boren knew or had reason to know that Brown's supervisors would not closely monitor him even though they said they would.

In summary, Plaintiffs did not point to evidence sufficient to create a genuine factual dispute on any of the following issues: (1) that Boren was personally involved in the pursuit or the shooting, (2) that he directed Brown to act unlawfully, (3) that he had a policy or custom that resulted in Brown's deliberate indifference to Plaintiffs' constitutional rights, or (4) that Boren knew that Brown would use excessive force but failed to stop him from doing so. Even under Plaintiffs' version of Boren's involvement, the record does not support the conclusion that he violated clearly established law regarding his supervisory responsibilities. Boren is thus entitled to summary judgment on his qualified immunity defense as to all of Plaintiffs' individual capacity § 1983 claims against him.

## III. Plaintiffs' Claims Against CCG

In addition to their claims against Brown and Boren, Plaintiffs assert that CCG is liable because it had an official policy or custom that caused a constitutional violation. As discussed above, Plaintiffs did not establish a constitutional violation based on the pursuit of the Pontiac or Brown's first round of shots. Thus, CCG is entitled to summary judgment on Plaintiffs' claims that are based on this conduct.

Because CCG's summary judgment motion relied primarily on its contention that Brown committed no constitutional violations, its motion for summary judgment does not present the

42

issue of whether it would be entitled to summary judgment even if Brown's second round of shots violated the Fourth Amendment. The record has not been developed on the issue of whether CCG had an "official policy" that caused the constitutional violation. *Monell*, 436 U.S. at 694. As discussed above, Defendants did argue that Boren did not have any policies, practices, or customs that contributed to a constitutional violation here, and Plaintiffs did not point to evidence that Boren had an official policy or an unofficial custom or practice that caused a constitutional violation here. So, to the extent that Plaintiffs intend to rely on Boren as CCG's final policymaker to support their *Monell* claims against CCG, that claim fails. If Plaintiffs seek to establish municipal liability based on policies or practices other than Boren's, however, they shall not be prohibited from engaging in discovery on this narrow issue. Because this narrow issue is not ripe for determination today, the Court declines to grant CCG summary judgment at this time on Plaintiffs' § 1983 Fourth Amendment claim based on Brown's second round of shots.

## IV. Plaintiffs' State Law Claims

Plaintiffs bring various state law claims against Defendants, including claims for excessive force, negligence, wrongful death, and battery. Defendants assert that they are entitled to immunity on all of these state law claims.

A.  Claims Against CCG

CCG argues that it is entitled to sovereign immunity on any state law claims against it.  CCG "is a consolidation of the former governments of the City of Columbus and the County of Muscogee." *Bowen v. Columbus*, 349 S.E.2d 740, 741 (Ga. 1986). CCG's tort liability is "the tort liability applicable to counties." *Id.* (quoting CCG Charter § 8-202).  A Georgia county may not be sued in a state court of Georgia because "sovereign immunity extends to the state and all of its departments and agencies," including counties.  *Carter v. Butts Cty., Ga.*, 821 F.3d 1310, 1323 (11th Cir. 2016) (quoting Ga. Const. art. I, § 2, ¶ IX). Thus, if Georgia sovereign immunity law applies, CCG would be entitled to sovereign immunity on all state law claims against it, including the official capacity state law claims against Brown and Boren, unless Plaintiffs demonstrated that CCG waived its immunity.  Plaintiffs argue that CCG waived sovereign immunity under O.C.G.A. § 36-92-2, which waives sovereign immunity up to specified limits for losses "arising out of claims for the negligent use of a covered motor vehicle."  But Plaintiffs' claims are based on a shooting, not on the negligent use of a covered motor vehicle, and Plaintiffs did not establish that CCG waived its sovereign immunity for their state law claims.  Thus, if Georgia law applies, CCG is entitled to sovereign immunity.

Plaintiffs argue that Alabama law applies to their claims. They further maintain that under Alabama law, there is no sovereign immunity as to their official capacity claims against Brown even though they are considered claims against CCG. Instead, they argue that under Alabama law they may assert such official capacity claims if they can establish that Brown acted in bad faith or with malice or willfulness. While this standard may apply to claims against an officer in their individual capacity, Plaintiffs pointed to no authority that a Georgia department or agency's sovereign immunity as to state law claims does not extend to an action brought in a Georgia federal court for claims by Georgia citizens who were injured in Alabama by a Georgia law enforcement officer following a cross-border high-speed chase that originated in Georgia. *Cf. Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1499 (2019) (concluding that a state agency retains its immunity from private suits both in courts of the agency's state and in courts of other states);[13] *cf. also Brown v. City of Huntsville*, 608 F.3d 724, 743 (11th Cir. 2010) (noting that under Alabama law, a city is not liable

---

[13] Plaintiffs rely on *Faulkner v. University of Tennessee*, 627 So. 2d 262 (Ala. 1992), where the Alabama Supreme Court concluded that the U.S. Constitution's Full Faith & Credit clause did not require Alabama to extend sovereign immunity to a Tennessee university on fraud and breach of contract claims brought by an Alabama student whose coursework was completed in Alabama but whose degree was later revoked by the university. In support of this conclusion, the Alabama Supreme Court relied on *Nevada v. Hall*, 440 U.S. 410 (1979), but that case was expressly overruled by *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485 (2019), which concluded that States have immunity from private suits both in their courts and in courts of other states.

for the intentional torts of its employees and concluding that the district court did not err in granting immunity to a city on a plaintiff's state law assault and battery claims based on an officer's unjustified use of pepper spray and other force). Therefore, the Court concludes that CCG is entitled to sovereign immunity on all of Plaintiffs' state law claims against it.

B.    Claims Against Brown and Boren

Brown and Boren argue that they are entitled to state law immunity from Plaintiffs' state law claims against them in their individual capacities.      Plaintiffs argue that Alabama's discretionary function immunity rules apply, while Defendants contend that Georgia's official immunity rules apply.      There appears to be no significant conflict between the laws of Georgia and Alabama on this issue under the facts of this case because both states shield law enforcement officers from liability in their individual capacities unless the officers acted in bad faith or with malice.      Under Georgia law, law enforcement officers are entitled to official immunity on individual capacity state law tort claims against them for their discretionary acts unless they acted "with actual malice or with actual intent to cause injury." *Kidd v. Coates*, 518 S.E.2d 124, 125 (Ga. 1999) (quoting Ga. Const. Art. 1, § 2, ¶ IX(d)). "The phrase 'actual intent to cause injury' has been defined in a tort context to mean 'an actual intent to cause harm to the

plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury.'" *Id.* (quoting *Frame v. Boatmen's Bank*, 782 S.W.2d 117, 121 (Mo. App. 1989)). Similarly, under Alabama law, a law enforcement officer is entitled to immunity from individual capacity state law tort claims unless the officer "acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Brown*, 608 F.3d at 741 (quoting *Ex parte Estate of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006)).[14]

Plaintiffs argue that Boren's training, supervision, and retention of Brown despite Brown's past performance issues demonstrates that Boren acted with malice. As discussed above, however, Plaintiffs did not point to evidence that Boren was on notice that Brown would use unconstitutionally excessive force but failed to stop him from doing so. Without such evidence, Plaintiff cannot establish that Boren acted with malice or bad faith. Accordingly, Boren is entitled to state law immunity under both Georgia and Alabama law.

Turning to Plaintiffs' state law claims against Brown, the Court finds that for all the reasons Brown is entitled to qualified immunity as to the pursuit and the first round of shots, he is also entitled to state law immunity for this

---

[14] This immunity only applies to peace officers acting in their discretionary authority. Pursuing a fleeing suspect and using force in the course of making an arrest are discretionary functions.

conduct under both Georgia and Alabama law. But, as discussed above, with regard to the second round of shots, there is evidence to support a conclusion that Brown intentionally fired ten shots into the Pontiac after he should have been able to see that it no longer posed a serious threat of harm. From this, a jury could infer an actual intent to harm Plaintiffs. The Court thus finds that Brown is not entitled to state law immunity under Georgia or Alabama law.

CONCLUSION

As discussed above, the Court denies Defendants' summary judgment motion as to (1) Plaintiffs' individual capacity § 1983 claims against Brown based on the second round of shots, (2) Plaintiffs' § 1983 claims against CCG based on the second round of shots, and (3) Plaintiffs' state law claims against Brown based on the second round of shots. The Court grants Defendants' summary judgment motion as to all other claims.

Within fourteen days, the parties shall submit a joint proposed scheduling order with deadlines for expeditiously completing discovery and dispositive motions.

IT IS SO ORDERED, this 13th day of December, 2019.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA